MURPHEY, Appellant, vs. WEIL, Respondent.

| 92 | 467 |
| 98 | 479 |

*January 30 — March 10, 1896.*

*Contracts: Construction: Disallowance of patents: "Thermostat:" "Automatic machine:" Joint promise: Rescission: Judgment.*

1. Extrinsic evidence as to the meaning of the word "thermostat" in a contract is inadmissible, that word having a fixed and definite meaning.

2. A contract of sale of corporate stock provided that the vendors should refund to the vendee a specified part of the purchase money if the patents applied for by one of the vendors "for thermostat and automatic machine" should be disallowed in substance. There were pending at the time six applications by such vendor for patents on thermostats or improvements in thermostats, and one application for a patent on a clockwork device to change automatically, at predetermined times, the temperature at which a thermostat would maintain the heat. *Held,* that such clockwork device was the "automatic machine" referred to in the contract.

3. Under such contract the vendee was entitled to a return of the specified part of the purchase money if the patent on the automatic machine was disallowed in substance, even though all the other patents were allowed.

4. The contract of sale being a joint one on the part of the vendors, and there being nothing to show any severalty of interest, the promise to refund is construed as a joint promise; and the vendee having, as authorized by one of the vendors, paid for the stock by advancing the purchase money directly to the corporation, the other and surviving vendor became liable, on the disallowance of the patent for the automatic machine, to refund the agreed portion of the purchase money.

. 5. No rescission or return of the stock was necessary in such case to entitle the vendee to enforce the contract. .

6. A judgment in favor of the defendant upon one of three counterclaims, but not specifically disposing of the others, is *held* a bar to any future recovery upon such others, where it recites the verdict upon them in favor of the plaintiff.

APPEAL from a judgment of the superior court of Milwaukee county: R. D. MARSHALL, Judge.   *Affirmed.*

This is an action to recover $12,500, claimed to be due from the defendant to the plaintiff as a balance of the purchase money of certain shares of corporate stock under the terms of the following contract:   '

" Agreement made and entered into this 23rd day of March, 1887, by and between H. E. Jacobs and *N. S. Murphey,* of the first part, and *Benjamin M. Weil,* of the second part, all of Milwaukee, Wisconsin.

" Witnesseth, the parties of the first part agree to sell and deliver to the party of the second part two hundred and fifty shares ($25,000) in full-paid capital stock of the Jacobs Electric Company of Milwaukee, Wisconsin, for the sum of twenty-five thousand dollars ($25,000), to be paid as follows: $13,500 to be paid at this date; $1,000, May 1, 1887; $1,000, June 1, 1887; $3,000, July 1, 1887; and $6,500, October 1, 1887, — without interest; $12,500 of said money to be advanced and loaned to said company by the parties of the first part.

" It is further agreed that the parties of the first part will, for the same consideration and at the same time, sell and deliver to the party of the second part two hundred and fifty shares ($25,000) in full-paid stock of the Electric Temperature Controlling Company of Milwaukee.

" It is further agreed that, if the patents applied for by Jacobs on the invention for thermostat and automatic machine be disallowed in substance, the parties of the first part

agree to refund to said *Weil* $12,500 of the money paid here-
under.

"Witness our hands and seals this 2nd day of April, 1887.

"H. E. Jacobs,    [Seal.]
"N. S. Murphey,   [Seal.]
"Benj. M. Weil,   [Seal.]"

Mr. H. E. Jacobs, one of the contracting parties, died be-
fore the commencement of this action, and his interest in
the contract was assigned to the plaintiff by his administra-
tor.   The defendant's answer was quite long, and, so far as
necessary to be stated to understand the questions involved
in this action, consisted: (1) Of defensive matter, to the
effect that the stock sold and delivered to the defendant was
not full-paid stock; that the conditions to be performed by
the plaintiff on his part had not been performed; and that
the patents referred to in the last part of the contract had
been disallowed, and consequently that the plaintiff cannot
recover.   (2) A first counterclaim on the ground that the
contract was induced by fraudulent representations as to the
value of the patents.   (3) A second counterclaim for dam-
ages on the ground that the stock transferred was not fully
paid.   (4) A third counterclaim for damages on the ground
that the patents named in the last clause of the contract had
been disallowed in substance; that the defendant had ad-
vanced to the corporation $6,000, which was in fact a part
payment of the $12,500 of deferred payments provided for
by the contract in question, which said money was, by di-
rection of *Murphey* and Jacobs, advanced directly to the
company and used in its business, instead of being paid first
to *Murphey* and Jacobs, and by them advanced and loaned
to the company, as contemplated in the contract.   This sum
of money was sought to be recovered under the third counter-
claim.

It appeared by the evidence that prior to the making of
the contract in suit the two corporations named in the con-

Murphey vs. Weil.

tract, viz. the Electric Temperature Controlling Company and the Jacobs Electric Company, had been organized, and that at the time of the making of the contract the plaintiff and Jacobs owned all of the stock of both corporations. The stock of each corporation was originally paid for by the assignment to the Jacobs Electric Company of certain alleged inventions, and the right to the assignment of all future inventions by Jacobs of improvements in thermostats, or devices for regulating temperature in rooms. At the time of the assignment to the corporations of these inventions, present and prospective, of Jacobs, to wit, February 21, 1887, such inventions were described in the assignment as follows: First, an application for letters patent on a device known as an " Automatic Adjustment of Thermostat; " second, application for letters patent for automatic device to open and close drafts of furnaces and stoves; third, application for letters patent for improvements in thermostats. Prior to the execution of the agreement in suit, other applications for patents in the same general direction had been made by Jacobs, so that at the time of making of such contract, viz. April 2, 1887, application had been made by Jacobs for seven patents, described as follows: Application No. 212,383, for improvement in contact devices for thermostat; application No. 216,409, for improvement in electric temperature controlling device; application No. 365,438, for improvement in thermostats; application No. 363,644, for improvement in electric temperature controlling device; application No. 363,645, for improvement in electric temperature controlling device; application No. 365,600, for improvement in electric temperature controlling device; application No. 214,595, for pole changer for thermostats. It appears that two of these patents (No. 216,409 and 212,383) had been allowed in March, 1887, but that no patents had been issued thereon at the time of the making of the contract, because the fees for the issuance of patents had not

been paid; and it is claimed that the parties, when they made the contract, did not know of the fact that they had been allowed. All applications except No. 214,595 covered alleged improvements of various kinds in thermostats, either in the thermometric apparatus, or in the apparatus immediately connected with the dampers of the stoves, or both. Application No. 214,595, denominated "Pole Changer for Thermostats," consisted of the combination with a thermostat of a clockwork device, which was to be wound up, and was to adjust and change the temperature at which the thermostat would act upon the dampers at certain predetermined times. This application is referred to in the case as the "Clockwork Device." The evidence showed that all of the applications above named were allowed, but that, though application No. 214,595 was in form allowed, a patent thereon was refused, as the result of interference proceedings brought by the Butz Thermo-Electric Company.

At the conclusion of the trial the court directed a verdict by which the jury found in favor of the defendant and against the plaintiff on the cause of action contained in the plaintiff's complaint; second, in favor of the defendant and against the plaintiff for the sum of $5,108 on the cause of action contained in the third counterclaim; third, in favor of the plaintiff and against the defendant on the causes of action contained in the first and second counterclaims. Upon this verdict judgment was entered in favor of the defendant, dismissing plaintiff's cause of action, and for $5,108 and costs upon the cause of action set forth in the third counterclaim. From this judgment the plaintiff appealed.

For the appellant there were briefs by *Charles Quarles* and *H. J. Killilea*, of counsel, and oral argument by *Mr. Quarles, Mr. Killilea,* and *Mr. N. S. Murphey.*

For the respondent there was a brief by *Turner & Timlin,* attorneys, and *J. G. Flanders,* counsel, and oral argument by *W. H. Timlin* and *Mr. Flanders.*

WINSLOW, J.   This case was before this court upon a for-
mer occasion, and will be found reported in 89 Wis. 146.
The question then before the court was whether the court
below erred in granting a new trial on the ground of incon-
sistency in the findings of a special verdict which had been
rendered in the case upon a former trial, and it was held
that the new trial was rightly granted.   It was held upon
that appeal that the patent for the clockwork device, though
formally allowed, was disallowed in substance, because never
issued on account of its interference with the Butz patent.
The evidence upon this question is the same as upon that
trial, and therefore it is settled in the case that the applica-
tion for a patent on the clockwork device was "disallowed
in substance."   The contract in question provides that, "if
the patents applied for by Jacobs on the invention for ther-
mostat *and automatic machine* be disallowed in substance,
the parties of the first part agree to refund to said *Weil*
$12,500 of the money paid hereunder."   It is apparent that
if the words "*automatic machine*," in this clause of the con-
tract, must be held to refer to the clockwork device, then
the application for a patent for an "automatic machine"
has been disallowed in substance.   This was the construc-
tion placed upon it by the trial judge, and upon this con-
struction he decided the case and directed a verdict for the
amount which it was conceded the defendant had advanced
to the business.   If he was right in his construction of the
contract, the judgment must be affirmed; if wrong, then
there should be a new trial.

It is claimed by the plaintiff that the court was not justi-
fied in construing the words "automatic machine" as refer-
ring conclusively to the clockwork device, but that there
was evidence in the case which would justify the conclusion
that the word "thermostat," as used in the contract, referred
to the thermometer and the expanding metal strips upon
the wall of the room, and that the words "automatic ma-

chine" referred to the electro-magnetic apparatus by means
of which the dampers of the furnace are opened or closed
as the metal strips on the wall open and close an electric
circuit. From this premise it is argued that the question as
to the meaning of the words "thermostat and automatic
machine," as used in the contract, was a question for the
jury and not for the court.

"Thermostat" is a word with a definite and certain mean-
ing, both in ordinary parlance and as used by heating en-
gineers. It means a self-acting apparatus for the regulation
of temperature. This is what a thermostat is now, and
what it always has been, however simple or however com-
plicated it may be. It includes the whole apparatus,— as
well the expanding strip or strips of metal or other sub-
stance upon which the heat first acts as the intermediate
wires, magnets, or other apparatus, if any, by which the
dampers of the furnace are opened or closed as the strips
expand or contract. The word "thermostat" being, then,
a word of fixed and definite meaning, that meaning must be
attached to it when it is used in a contract. Parties cannot
use terms with a fixed and certain meaning, and then dis-
claim such meaning,— at least, without reformation of the
contract, and no reformation is sought or claimed here.
*Janesville Cotton Mills v. Ford*, 82 Wis. 416. There is no
ambiguity or uncertainty as to what is meant by the word
"thermostat." Therefore its meaning could not be affected
by extrinsic evidence. *Kirch v. Davies*, 55 Wis. 287.

Starting with this premise, and referring to the evidence,
we find that at the time of the execution of the contract in
suit there were pending six applications for patents which
were for thermostats pure and simple or improvements in
thermostats, and we find one application (No. 214,595) which
was an application for a clockwork device to be used in con-
nection with a thermostat. This device was to be wound
up with a key, and its object was to automatically change

the position of the expanding strips of metal at certain pre-determined hours of the day or night, so that for a certain number of hours of the day the thermostat would maintain the heat at a lower degree than during the remaining hours. It was expected, for instance, that by the aid of this clock-work the temperature might be maintained at seventy de-grees during the daytime, and at sixty degrees during the night, with no other action on the part of human agencies than the replenishing of the fire and the winding of the clockwork. This was manifestly an "automatic machine." There were therefore six applications for patents upon ther-mostats, and one application for a patent upon an automatic machine (which was not a thermostat), pending when the contract was made by which it was provided that, "if the patents applied for on the invention *for thermostat and au-tomatic machine* be disallowed in substance," then the de-fendant's purchase money was to be refunded. The words are not "thermostat *or* automatic machine." If so, then it might be reasonably argued that the automatic machine re-ferred to was the thermostat, which is in fact an automatic machine itself. But the words are "thermostat and auto-matic machine." They are distinct. The automatic ma-chine is in addition to the thermostat. In this state of the evidence, it appearing that there were pending at the time, and included in the negotiations of the parties, six applica-tions for patents on improvements in thermostats, and one application for patent on an automatic machine to be used in connection with a thermostat, there is no room left for construction. The contract becomes absolutely certain, and the automatic machine referred to can be nothing but the clockwork device,— the only automatic machine, aside from a thermostat, for which a patent was applied for at the time of the contract. This being our conclusion as to the construction of the contract, it becomes unnecessary to con-sider the parol evidence which was introduced on both sides

tending to throw light upon the meaning of the words used. Under the view we have taken, it is immaterial. It may be said, however, that such evidence was, in the main, very strongly corroborative of the meaning which we have attributed to the words as matter of law.

The patent for the automatic machine having been disallowed in substance (*Murphey v. Weil*, 89 Wis. 146), the question is whether this fact entitles the defendant to a return of his purchase money, when it appears that the six applications for improvements in thermostats were all allowed. Upon this question the trial judge said, in deciding the cause: "I think the language used in the contract, 'That if the patents applied for by said Jacobs on the invention for thermostat and automatic machine be disallowed,' must be construed as covering all the patents. That is, not all the patents must be disallowed, in order that the cause of action might accrue for the recovery of the money, but that, if any one of the patents was disallowed in substance, that the cause of action would accrue. That is my interpretation of that contract. It appears conclusively that one of the patents was disallowed in substance in the patent office. In my judgment, that was sufficient to allow the bringing of the action to recover back the money." We quite agree with this interpretation of the language of the contract, and think it the only reasonable view to take of the provision. Furthermore, the question would hardly seem to be an open one in this case, for the reason that it was held upon the former appeal (*Murphey v. Weil, supra*) that, if this application (*i. e.*, the application for a patent on the clockwork device) has not been allowed in substance, the defendant is entitled to have the purchase money to the amount of $12,500 returned.

We regard the promise to refund the purchase money to *Weil* as unquestionably a joint promise. The contract is apparently joint, from start to finish. The complaint alleges that Jacobs and *Murphey* jointly owned the $12,500 worth

of stock in the Jacobs Electric Company when the contract was made. The agreement to sell that stock to *Weil* is joint in terms. The payments were evidently expected to be made to either, as there is no provision for separate payments. The agreement to advance to the corporation the amounts paid by *Weil* for the stock is joint. The agreement to deliver the shares in the second corporation is joint. In fact, no separate interest, as between *Murphey* and Jacobs, is disclosed anywhere; and, in the absence of anything showing severalty of interest, the promise to refund should be construed as a joint promise. *New Haven & N. Co. v. Hayden*, 119 Mass. 361. The contract being joint, and the evidence showing without dispute that one of the joint contractors, Jacobs, authorized *Weil* to pay his purchase money by advancing it directly to the corporation, there can be no question as to the liability of the surviving joint promisor, on the happening of the contingency which requires repayment of such purchase money. Nor was rescission or return of the stock necessary to entitle *Weil* to enforce the contract, because the contract does not require it, nor can it be reasonably construed to require it. It seems to have been considered (as the fact apparently is) that if the patents applied for were not allowed in substance the stock would be valueless.

It is argued that the judgment is defective because it does not specifically dispose of the issues raised by the first and second counterclaims. The verdict, which is recited in the judgment, disposes of every counterclaim; there has been no withdrawal of any of the counterclaims; and the judgment in favor of defendant upon the third counterclaim alone we regard, under these circumstances, as a complete bar to any future recovery upon the first or second counterclaim. *Morgan v. C., M. & St. P. R. Co.* 83 Wis. 348.

*By the Court.*— Judgment affirmed.

MARSHALL, J., took no part.